20-1142 from the District of Minnesota, United States v. Mario Spencer and 20-1190 from the District of Minnesota, United States v. Ahmad Farah. Very well. Ms. Weinman, we'll hear from you first. Thank you, your honor. Good morning and may it please the court. Sarah Weinman, Assistant Federal Defender on behalf of Ahmad Farah. Your honors, I'd like to use 10 of the 20 minutes the court has allowed co-appellants for argument this morning, reserving two minutes of my time for rebuttal. Mr. Farah, you'll just need to watch the clock and stop on your own because it will continue if you don't. Okay, thank you. Mr. Farah and Mr. Spencer raised two issues in common on appeal. With the court's indulgence, I'd like to focus my portion of the on the prosecutorial misconduct issue and counsel for Mr. Spencer will focus on the jury instruction issue. But of course, I'm happy to answer any questions the panel may have on any of the issues Mr. Farah raises. To fully appreciate the gravamen of the prosecutorial misconduct that occurred in this case, it's important to keep in mind two background facts. One is what the theory of is when the prosecution became aware of that theory. The theory of defense was that the government could prove neither the knowledge element nor the takings element of robbery because the theft was an inside job involving a store clerk, Ali Mohammed, whom the government had failed to call. Bless you. Thank you. Now, defense counsel alluded to this theory during the opening statements, but at least as of the fourth morning of trial, which was the day before closing arguments, the government was fully aware of the theory of defense and in fact summarized it for the district judge at a sidebar. This is a trial transcript, page 637, when the prosecutor summarized the defense theory as that Ali Mohammed was quote, somehow involved with this robbery on this date in question or somehow complicit in this robbery in this date in question. And then at pages 639 through 641 of the transcript, defense counsel confirmed that theory for both the prosecution and the district judge, stating that the missing witness issue was looming over the trial and that it led to an issue as to whether there really was force or consent and that it led to the theory that the government had not properly investigated the case. So I think it's important to keep that in mind because that's what the prosecution knew going into closing argument, that the theory of defense was not identity, but was instead this missing witness issue and an inside job theory. Knowing that. Counsel, I do have a question. I certainly agree that there are some problems with the closing statements, but I'd like to have you continue your argument in the context of the plain error standard of review. Absolutely. So I would argue that the error here was plain. Under the case law, it's clear that a prosecutor may not insinuate facts not in evidence or personally place himself as a 13th juror in the case. So I think under the case law, we have the first two prongs. I would like to address the prejudice prong of the plain error standard. And to do that, I think it's important to start with the quotes themselves from the record. So the prosecutor stood up and at the outset of closing statements, this is at pages 856 through 858, the prosecutor said, some of you may have thought to yourself last week while we were presenting you methodically and thoroughly with all of this evidence, that why are we even here? Are we missing something? Is there some big mystery? Is there some twist that we're waiting for? And then he continued on page 857, and you bet that the as it can in order for you to make a fair and just determination. That's why we spent all last week presenting all of that evidence to you. You're not missing anything. On the following page 858, the prosecutor stated, things you haven't heard, things you might be guessing about, that's speculation, and that's not a reasonable doubt. Now, your honor, I think this goes to the cumulative statements that the prosecutor made during closing arguments. At the end of the initial closing argument at 888, the prosecutor reiterated, I wouldn't be doing my job if we weren't thorough or methodical. But ladies and gentlemen, your job has got to be really easy with all of the evidence. So at that point, the defense counsel gave their summation in which, they focused on this missing witness theory and sloppy investigation theory, focusing on the evidence that wasn't there and arguing that at best, because this smelled of an inside job, the government could prove perhaps larceny, but not the knowingness and takings elements of robbery, the offense charged. So then we get to the rebuttal argument. Right away, the prosecutor stands up and says at page 939, I've yet to meet 12 jurors that can disregard an overwhelming amount of evidence and go after some speculation and argument that is proposed by two defense attorneys. And then at 940, and here I think is where we really get to the heart of the matter. In this case, there are many reasons why we might call one witness and the other. You saw it repeatedly with the officer's partners. We called the one witness, but we did not call their partner. And we already spent five days on everything. Maybe Mr. Muhammad wasn't able to be obtained. Maybe Mr. Muhammad is dead. That statement right there, maybe Mr. Muhammad is dead, went too far. It insinuated a fact not in reality. It took the leap from saying disregard the missing evidence to actually asserting a fact that the prosecution simply had no reason to believe was true. And I think because of the nature of the statement that maybe this missing witness was dead, there was also this subversive or sinister element to the comment, particularly since the jury had heard evidence that Mr. Muhammad kind of vanished after the robbery. A prosecutor has heightened ethical responsibilities. That's been clear since the Supreme Court's case Berger, going back to 1935. Here, by insinuating that this missing witness was dead, the prosecutor crossed the line of those ethical responsibilities. It would have been one thing to say perhaps that the prosecutor, it would have been one thing for the prosecutor to say perhaps that the record was silent or to simply leave it at the witness was unavailable. But by insinuating that he was dead, he crossed the line. And the cumulative effect of all of these statements, the assurances that the prosecutorial team was thorough and methodical, and that all of the relevant evidence had been presented, that there was no missing evidence, and that this key witness perhaps was dead, had a prejudicial effect on Mr. Farah, as well as Mr. Spencer. And beyond that, there was no curative instruction given, which is the second point in the prejudice analysis on plain error. In fact, this... Oh, Your Honor, I see you talking, but I can't hear you. Yeah, I'm sorry. I had it on mute. I just wonder how probative the curative instruction point is if there was no objection. That's an interesting question, Your Honor. And it's one that I think this court has answered in Cruz Padilla, where, which was... Go ahead. Go ahead with your thought on that. Sure. It was also a plain error case. And yet, in its prejudice analysis, the court noted the lack of a curative instruction, did prejudice the defendant, and remanded the case for that reason. Well, certainly, there wasn't a cure of instruction. So, if the comments were so prejudicial that one was necessary to solve the prejudice problem, there wasn't one, I grant you that. Sure. And again, that's just one factor in the prejudice analysis. So, however much weight the court wants to assign that factor, I do think it favors a finding of prejudice, as does the cumulative nature of the comments. Do you care to save your remaining 35 seconds for rebuttal, or did you have another point you wanted to make? No, Your Honor. Thank you. I will save my time. Very well. Mr. Drosky, we'll hear from you. Thank you, Your Honors. Again, Tim Drosky appearing on behalf of Mr. Spencer. I'm not going to be spending time arguing Mr. Spencer's constitutional challenge to the Hobbs Act, since we recognize that it would require the en banquier circuit to reverse on that issue. Instead, I'll be focusing on the jury instruction challenge to the Hobbs Act instruction that's raised by both Mr. Spencer and Mr. Farrar, as well as Mr. Spencer's unique sentencing issue. With respect to the jury instruction issue under the Hobbs Act, this court in the United States v. Dobbs case upheld a Hobbs Act conviction that involved a mom and pop convenience store. And Judge Haney and his concurrence in that case stated, and I quote, it is hard to imagine a robbery of a commercial establishment with less of a connection to interstate commerce than this one. Well, this is that case. In Dobbs, at least, the convenience store was located at the tri-state border and thus sold to residents of three different states. This case, instead, involved a local, the local Penwood market that served the local neighborhood residents of the North Minneapolis community. What that means is that under this court's current Hobbs Act jurisprudence, this case is at the very outer bounds of Congress's authority under the Commerce Clause. And that's what makes the jury instruction that was given with respect to the interstate commerce requirement under the Hobbs Act, particularly harmful and prejudicial. The instruction was confusing and inconsistent. Because while it started by stating that a required element was proving an effect on interstate commerce, then as the instruction went on, it referred solely to commerce, no longer referring to it as interstate commerce, and referring to examples of commerce as being ones that could have a intrastate effect. That gave the jury the impression that they could convict based solely on intrastate commerce, which would not be proper under the Hobbs Act and the scope of Congress's authority. This is Judge Ross. I do have a question about that. But given the very broad interpretation of commerce by this circuit in the Dobbs case, is there really any discernible difference between interstate commerce and intrastate commerce such that the interchangeable use of the terms would really lower the government's burden of proof in this case? Well, two things, Your Honor. The government itself acknowledged, and that's on page 50 of its brief, that the conviction required an effect on interstate and not intrastate commerce. And also, you know, Dobbs and other cases from this court linking back to Lopez do recognize that there should be a substantial effect on commerce. That's at least what Lopez says in letter. Now, granted, we challenge whether this court's authority has, in fact, honored that and recognized that right now we're bound by that authority. But there still is a critical requirement that there be an effect on interstate commerce. And in Dobbs, for example, even if it was de minimis, it was still there. The convenience store, for example, was at the tri-state border, a fact that's not here. And critically, some of the key examples that were given in the jury instruction for how an effect on commerce, again, not qualifying it as interstate commerce, could be proven were things like depletion of the assets of a business operating in commerce. Well, here, all the cash from the convenience store was deposited in a local in-state bank. Temporary closing of a business to recover from the robbery or business slowdown as a result of the robbery. Again, the customers who weren't going to the Penwood market during the limited amount of time that it was closed due to the robbery were local community residents, as transcript pages 540 and 544 reflect. And so there is the danger here that the jury convicted Mr. Spencer and Mr. Hurrah based solely on its assessment that intrastate commerce was affected here. And what's critical is that... Mr. Drosky, this is Judge Grunder. Was this issue preserved? Was it argued to the district court? Well, it was preserved, Your Honor. So at first, the parties submitted joint instructions that used the Matthew Bender definition at first, which uses the term interstate commerce and gives that the meaning of involving more than one state. And then at the end, it had different borrowed from the A Circuit instruction, which again, uses the term commerce. What was objected to, and this is at docket entry 200, was to the Matthew Bender formulation. And the objection was that it is the A Circuit's construction that is the most accurate reflection of the and specifically what was requested there is that the term commerce be used. And that's specifically in that docket instruction. And what's critically different about the A Circuit instruction is it would have consistently used the term commerce all the way throughout, including specifically defining commerce as having an intrinsically interstate component for purposes of the Hobbs Act and the jury instruction definition. That wasn't there in the instruction that was given. And for that reason, there should be a reversal for a new trial with a properly instructed jury on that element. I'd also like to turn to the obstruction. Question. Was there an instructions conference after the submission of the letter to which you refer on RDoC 200? Was there a separate conference with the judge as is typical in a trial that's recorded on a transcript? There is, Your Honor. I don't have the transcript in front of me. In that instructions conference, was this objection raised? Well, the objection that was raised was, again, generally to the elements. I will acknowledge that the specific discussion concerned largely the mens rea component. But again, the general objection was made. I would also make the point that even under a plain error standard, again, the error here is clear because this case was at the very outer bounds and prejudicial for that reason. There is the risk here that the jury convicted based on intrastate commerce, which would exceed Congress's authority under the Constitution. So under a plain error analysis, you get to the same place. But we maintain that the issue was preserved. I would like to turn briefly to the obstruction of justice enhancement issue. And the enhancement was applied here improperly as a matter of law because it increased Mr. Spencer's time behind bars for informing the witness, Ms. McCarver, of her constitutional rights, the constitutional right against self-incrimination under the Fifth Amendment. Now the sentencing guidelines text and notes both show it does not apply. The enhancement applies to one who willfully obstructs or attempts to obstruct the administration of justice. But telling someone to exercise their constitutional right as opposed to threatening or intimidating cannot be obstruction. And the comment makes this clear. It says obstruction includes threatening, intimidating, or otherwise unlawfully influencing a witness. But there's nothing unlawful about the exercise of a constitutional right. That's the quintessential example of what's not unlawful. This is Judge Grosz. Even if that's true, what about the statement, don't tell on me? How do you overcome that one? Well, two things, Your Honor. It's not clear that that's from an entirely separate conversation. So you have Exhibit A, an earlier audio conversation, that's where that comment was made, separate from Exhibit B. When you listen to the audio of Exhibit A, it's not talking about the context for testifying at court proceedings. It's pretty clear from the evidence that, from the audio, what they're talking about are girlfriend issues. Ms. McCarver, what was noted, they had previously been involved. Mr. Spencer had a different to some of that drama. And the overall tone of the conversation reflects that. It's also not clear that the district court relied on Exhibit A. It's Exhibit B that contained a specific reference to researching pleading the Fifth that was the focus in the PSR, the focus at the hearing. And when it comes to... Mr. Groszky, why is it determinative that or hide from investigators and so forth? And I suppose encouraging someone to do that could be obstruction. So why is there not a concept of what was recommended determinative? Well, there's not a constitutional right in the Bill of Rights to leave the country. There's a constitutional right against self-incrimination. And what's critical here, is by saying research the Fifth, it's inherently going to the witness's own protection. Pleading the Fifth is the right against self-incrimination. Mr. Spencer saying that is doing it for the witness's protection. It's clearly for her own benefit. Is that a factual question as to why he was doing it? Or is it conclusively presumed that it was her benefit? I thought the judge was for his benefit. Well, I'd say two things. First, as a factual matter, in the context, it clearly was for her benefit. If you look at Exhibit B, and this would be at 535, what he says is do some legal research on it. It's called Pleading the Fifth. If they ain't giving you no favors, they ain't giving you nothing in exchange for what's going on, get on your phone and look that up. So he wasn't saying don't testify no matter what. If the government wouldn't give you immunity, look up Pleading the Fifth. And I'd say that the district court, if you look at transcript 388 to 397, I know my time is up, but the district court acknowledged the risk of jeopardy here and would not allow the witness to testify unless either given immunity or first given the right to counsel, unless the government restricted his testimony, which it did. McManus is entirely an opposite because there the Fifth Amendment was never specifically invoked. Because it was here as a matter of law, that was the privilege against her self-incrimination. And for that reason, it was improper to apply the enhancement here under both the sentencing guidelines and the Constitution. Very well. Thank you for your argument. Mr. Nelson, we'll hear from you. Thank you, Your Honor. May it please the court. My name is Nathan Nelson. I represent the United States on appeal. I was also one of the trial counsel at the trial below. This court should affirm the district court in all respects. I'm going to focus my argument, however, on the same two issues that were focused on by defense counsel, namely the issue of whether there was plain error in the district court failing to intervene during the prosecutor's closing argument without objection from defense counsel and whether the district court erred in instructing the jury. I'll start with the issue of the prosecutorial misconduct. And here, Your Honor, I do think it is helpful to break down the closing argument into the initial closing argument and the rebuttal argument. Because at the time of the government's closing argument, the defendants were, as far as the government knew, still contesting the issue of identity. Despite what Ms. Weinman said, they were disputing whether they were the masked men in the store. And you can see that on page 831 of the transcript, where the district court explicitly asked Mr. Farr's counsel if he was conceding his presence in the store, and defense counsel declined to make that concession. As far as the government knew, it was being held to each and its burden of proof on all those elements. And that context is important in analyzing the government's closing, because the evidence of identity that they were the masked men in the store, as everyone now seems to agree, was overwhelming. So when the government began its closing argument by stating that some jurors might be wondering, why are we here? Are we missing something? And then argued to the jury, you're not missing anything. That was a proper argument and a proper reference to the fact that identity was not more difficult of a question than it seemed. The government wasn't implying to the jury that it had heard everything there was to hear about the case. We were arguing to the jury that the jury wasn't missing anything in its understanding of the case. That the obvious answer regarding identity was in fact the correct one. The same thing is true for the government's argument that the evidence was overwhelming. There is nothing improper with arguing that evidence is overwhelming, if that argument is grounded in things that the jury has heard. And that's what the government did here. It used the term overwhelming in connection with an extensive analysis of the witnesses and the exhibits that jury had heard. And in fact, again, as everyone now agrees, the evidence was overwhelming, at least with respect to the issue of identity. The statement about reasonable doubt. The prosecutor argued that reasonable doubt is not based on what ifs. It's not based on things you haven't heard or things you might be guessing about. This too is proper argument that reasonable doubt is not based on could not be based on a lack of evidence, as Mr. Farah argued. In fact, the prosecutor three separate times told the jury that reasonable doubt was based on the evidence or lack thereof. The prosecutor also told the jury to follow the judge's instructions, and the judge instructed that reasonable doubt could arise from a lack of evidence. Now, I will admit that the context on closing argument, the defendants did a couple of things. First, Mr. Farah's counsel directly called into question the prosecutor's confidence in the case, claiming that the confidence was hollow and it was not sincere. And Mr. Farah's counsel went even one step further, and he urged the jury to acquit based on the government's lack of confidence in its case, saying, and I quote, if they have a doubt, you should have a doubt. And these arguments having been made by the defendants, the district court did not clearly abuse its discretion in allowing the government to respond. So when the prosecutor argued he was in fact confident because he had yet to meet 12 jurors that could disregard an overwhelming amount of evidence and go in for speculation, that was a comment that was directly invited by the defendant's attacks on the prosecutor's confidence and the government's so-called doubts in its own case. And to be fair, I'm cognizant of the Supreme Court's guidance in Young that typically a prosecutor ought not to make such comments even when invited. But if we look at the concerns underlying prosecutorial misconduct, the concern is that the government should not be inviting the jury to decide the case on an improper basis. And here the government did not invite the jury to decide the case based on his confidence. Mr. Farah's counsel did that. And throughout the government's closing, the government repeatedly admonished the jury to decide the case on a proper basis. The prosecutor argued... Why all the talk about how methodical and thorough we were and how good the cops are? Why is that a proper argument? Well, I do believe it is a proper argument and I'll explain. With respect to the thorough and methodical presentation of the case, first of all, that was a comment that was tied directly to what the prosecutor called the arguing to the jury that they have had a thorough and complete look at the evidence of the case and can rely on the evidence in making their decision. This robbery lasted, Your Honor, about 30 minutes or about 90 minutes between the beginning of the robbery and the apprehension. The government called 20 witnesses over a four-day trial to address that. And I don't think it's improper for the prosecutor to argue to the jury that they've had a complete and thorough and in-depth look at the case. Counsel, this is Judge Gross. Does your argument also apply to the statement in rebuttal that one of the missing witnesses might be dead? Yes, Your Honor. I will argue that that was a proper argument and I'll explain why. I can understand you arguing that it's not reversible error, but I'm having trouble with your argument, including in your brief, that it was, quote, appropriate. I think what I would like the court to do is to view that particular argument in context. And what the prosecutor said was he was responding to a defense comment about the failure to call Mr. Muhammad. And what the prosecutor said was that maybe Mr. Muhammad, let me back up. He said there might be many reasons why we don't call someone or why we call only one of two people that were witness to something. And the prosecutor argued maybe Mr. Muhammad wasn't able to be obtained. Maybe Mr. Muhammad is dead. But then he followed with nobody knows. And I think that was properly calling attention to the jury that there was no evidence before the jury as to why Mr. Muhammad didn't testify. The prosecutor didn't imply special knowledge. In fact, the prosecutor said explicitly nobody knows why this guy is not here, why he's not testifying. And that was a proper response to the defense argument that the government did not call Mr. Muhammad because it was, quote, investigating him. That was the that was the insinuation and the argument made by Mr. Spencer's counsel during his closing. And the government is responding to that by saying there is no evidence before you as to why the government didn't call Mr. Muhammad. And you shouldn't draw a negative inference from the fact that the government did not call Mr. Muhammad. And in fact, your honor, I think this was showing some restraint on the side of the government because it could have been pointed out properly under this court's case law that the defendants also had the opportunity to call Mr. Muhammad, that they had the subpoena power and could have called him. This isn't a situation where Mr. Muhammad was particularly within the power of the United States to call. And in any case, your honor, the other bit of context I think is important is that the prosecutor immediately reminded the jury that they must base their decision on the evidence, not arguments of attorneys, including myself. That statement was made immediately following the references to the Mr. Muhammad. Do you see a difference between arguing that you've heard a lot of evidence, 20 witnesses and so forth, and arguing that we have a job to be methodical and thorough and we have done a thorough and methodical job as prosecutors and we as police officers have done a good job on this case? Do you see a difference between the two? I think, yes, your honor. I think there is a qualitative difference between the two, but as the Supreme Court has recognized, there's a lot of gray area when it comes to closing arguments. Closing arguments are made at the end of a long trial, sometimes in case of rebuttal in the heat of the moment, and the district court is the one vested with the discretion to draw the lines between what is or is not proper argument, especially in that gray area. Well, I don't know, you're saying that the prosecutor can go over the line, it's up to the district judge to pull them back. Why wouldn't it be up to the prosecutor to be trained properly on the distinction between those two qualitatively different types of arguments? You're right, your honor. Of course, the government has a duty to refrain from making improper arguments. That's absolutely true. I don't believe that these arguments were plainly improper. And that, of course, is the standard for this court on appeal. There might be things of statements of questionable propriety or that there's some looking back in hindsight, we wonder should it have been phrased that way? Should it have been stated that way? But that was a question for the district court. The only reversible error is if the prosecutor made comments that were so clearly out of bounds that the district court didn't have any discretion and should have intervened. And under the plain error standard that that error was so obvious that it deserves to be over, that the lack of objection deserves to be overlooked. And I do want to turn to the other elements of the plain error standard here, because the general instructions to the jury stating that statements of attorneys are not evidence, telling the jury to base their decision on the evidence presented at trial. And as I've stated, the prosecutor himself repeatedly admonished the jury to decide the case based on the evidence and not on things that he was saying. Finally, the evidence was, in fact, overwhelming as to guilt, because even under the defendant's own theory of the defense, there was still a forcible taking of property from the custody of the other employee, Mr. Bari. And the defendants would be guilty even under their own theory of defense under which one of the employees was involved. Before you go on to the next issue, was there any evidence presented about attempts to find Mr. Muhammad or why he was not called? I mean, sometimes the government puts on evidence, that we sent somebody out looking for him, we couldn't find him and so forth. Was there anything in the record about that? I believe there was, Your Honor. I'm not recalling exactly. There was an officer who responded immediately after the robbery who interviewed Mr. Muhammad. And I believe the testimony was that Mr. Muhammad confirmed a robbery had occurred. And then the government's case agent, Sergeant Swarzewski, I believe testified that he tried to I don't recall specifically what the testimony was in that regard. However, the government's counsel did represent to the court that it had attempted to serve Mr. Muhammad with a subpoena, but was unable to locate him for service. Turning to the jury instruction issue, Your Honor, this particular issue is not appropriate for this court's review, because the defendants have waived their claim. And the context here is important. One week before trial, the defendants requested the very essence of the Hobbs Act instruction to which they now object. Following the close of the government's case, the defendants for the first time requested the Eighth Circuit model instruction. But they explicitly, in fact, three times premised their request on an issue with the mens rea for robbery. That was stated during the district court's charge conference. Following the charge conference, the party submitted written submissions. And if you look at docket entry 201, that was one of Mr. Spencer and Mr. Farr's written submissions in which they stated, quote, from the defense perspective, our concern is that the modern instruction, the one the party submitted, dilutes mens rea, specifically by not making clear that the mens rea element applies to count two of the modern instruction. And then again, the following day before closing arguments, the district court, after overruling the defendant's objection, the defendants requested if they could just add one word to the party's joint instruction, add knowingly. And the district court explicitly asked Mr. Farr's counsel if adding that word would address the issue, and he confirmed that it would. So the bottom line, Your Honor, is that the defendants got the exact instruction they requested as to the issue of interstate commerce. They never raised any objection, concern, or issue with that instruction as it applied to interstate commerce, and they told the district court it had addressed their concerns. Even, Your Honor, if the defendants had not waived the claim, the district court did not plainly abuse its discretion. And here, I do want to address the standard of review for a moment, because I believe Mr. Farr argues in its brief that this should be de novo review. But all the parties agreed on what the law was. The district court agreed on what the law was as to interstate commerce. It was just a question of did the court properly communicate or articulate that law to the jury. And this court has held that the proper standard is abuse of discretion when you're dealing with the wording of jury instructions. And because the defendants did not preserve their claim on the grounds they now assert on appeal, this court should apply the plain error review, meaning that it can only reverse if there was a clear abuse of discretion, which did not occur here. Wouldn't they, though, have preserved it by submitting, at least initially, submitting the instruction that they wanted, that I guess cleared up or made more clear the interstate requirement? What they submitted, Your Honor, is a letter in which they asked the court to use the four-element formulation under the Eighth Circuit model. It's true, as Mr. Drozdowski indicated, that that model instruction does not use the word interstate commerce. In fact, it just says commerce in the element, the final element. But where the defendants have repeatedly represented to the court that their concern relates to mens rea, not to interstate commerce, where they make that representation three separate times, I'm not sure what the district court is supposed to do. The district court made an alteration to that jury instruction, and the defendants told the court that it had addressed their concerns. In any case, the instruction, Your Honor, was not a clear abuse of discretion. The third element of the instruction clearly stated, explicitly stated, that the jury could only convict if it found an effect on interstate commerce. And that's of particular significance because it's in the language of the element itself. The instruction then defined interstate commerce as commerce that goes through or between different states, again, reinforcing an interstate nature to the type of commerce necessary to support a conviction. The fact that the final paragraphs dropped the modifier interstate didn't undermine that clear language of the third element. Because what those paragraphs are discussing is, what does it mean to delay, obstruct, or affect? That's the thrust of those paragraphs. What do we need to show to show a delay, obstruction, or effect on the commerce element? Mr. Nelson, I'd like to turn quickly, if we could, to the reckless endangerment enhancement for Mr. Farrar. Yes, Your Honor. Do we know from the record whether this was imposed just based on a hunch, based on his past record, or something else? No, Your Honor. The government's theory was this. The evidence was very clear from trial that only Mr. Farrar and Mr. Spencer were occupants of the vehicle that fled from police. The government's position was that its burden was simply to show which one of the defendants was more likely the driver than the other. The government cited three categories of evidence. The first was that Mr. Spencer told the registered owner of the vehicle that he had a licensed driver with him. In essence, that the defendants themselves intended that Mr. Farrar would be driving the car. That was confirmed by the location of personal property in the vehicle. Mr. Farrar's wallet with his ID was in the driver's side door. His phone was at the center council, whereas Mr. Spencer's debit card was in the passenger side glove box, and Mr. Spencer's phone was on the passenger side floor. The government explicitly argued to the court that those pieces of evidence standing alone were sufficient to meet the low burden of preponderance. The government then cited Mr. Farrar's history, but explicitly said it was doing so just as solely corroborative. The district court cited all three categories of that evidence in making its finding. In light of that evidence, it was not clear error for the district court to find that Mr. Farrar was in the vehicle, and the court should affirm the district court on that sentencing issue as well. I see my time is up, and I thank you for hearing this argument. Very well. Thank you for your argument. Ms. Weinman, we'll give you two minutes for rebuttal. You may proceed. I appreciate that, Your Honor. Thank you. I have three quick points on the from Berger to Young. That's what the court and this court has held can lead to a finding of misconduct. The statement need not be an out-and-out lie, nor need it be direct. If it were, we would be arguing NAPU error here. Here, the prosecutor made implications, suggestions, and insinuations that they had thoroughly and methodically presented every piece of relevant evidence, that there was no missing evidence, that everyone had done a bang-up job on the prosecutorial team, and that one of the missing witnesses may be dead. That was improper. Two, as to the strength of the government's case, one of the prejudice factors, the defense counsel, and this is at pages 889 to 904, made very clear to the jury that if Mr. Mohammed was involved, then the government could at best prove only larceny, and that's because both the knowingness element and the takings element could not be proved beyond a reasonable doubt. Defense counsel also pointed out two other important facts. That's that the other store clerk who was present, Mr. Bari, had made some strange comments during his testimony and could be observed during the video having some kind of strange behavior, thinking that the whole thing was a joke, chatting on his phone, asking to go smoke a cigarette in the middle of this incident. So a jury very reasonably could have found that this was all told an inside job, or that at least the defendants knew that, didn't know that it was not an inside job. So for that reason, as to the strength of the government's case on the defense theory, this also warrants a finding of prejudice. The government simply had no evidence in the record to rebut the defense theory, and for that reason, they turned to these insinuations and implications. Third and finally, with regard to this idea of invited error, I do want to acknowledge that defense counsel's statements were inappropriate. By calling into question the prosecutor's personal ideas on the case, that was not appropriate. And when the prosecutor first stood up in rebuttal, he responded. When the defense counsel made those comments, the prosecutor did not object. He instead self-helped. He stood up, affirmed his confidence, and then went on to insinuate Mr. Muhammad's death. I think we've given you a little extra time, and you've used it. So at this point, we thank you for your argument. The case is submitted, and the court will file an opinion in due course.